# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Dependency of
T.M.D. and T.T.D.,

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

              Respondent,

       v.

DEMETRIUS JONES,

           Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 69023-0-I
(consolidated with
No. 69024-8-I)

ORDER AMENDING
OPINION

     The court on its own motion has determined the unpublished opinion filed September 23, 2013 shall be amended. Now, therefore, it is

     **ORDERED** that the unpublished opinion filed September 23, 2013 shall be amended as follows:

     **DELETE** the last sentence of the first paragraph on page 6, which reads:

     Jones appeals.

**REPLACE** that sentence with the following sentence and footnote:

Jones appeals.[1]

---

[1] On October 16, 2012 Jones filed a motion to enlarge time to file notice of appeal. The State filed an answer, and Jones filed a reply. The commissioner passed the motion to the panel to be considered along with the merits of the appeal. The court has considered the motion pursuant to RAP 18.8 and the motion is granted.

DATED this ___2nd___ day of ___October___, 2013.

_Appelwick, J._

WE CONCUR:

_Spearman, A.C.J._      _Becker, J._

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2013 OCT -2 AM 10: 17

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of T.M.D. and T.T.D.,

STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES,

          Respondent,

          v.

DEMETRIUS JONES,

          Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 69023-0-I
(consolidated with
No. 69024-8-I)

DIVISION ONE

UNPUBLISHED OPINION

FILED: September 23, 2013

APPELWICK, J. — For three years, Jones failed to make progress in addressing her mental health and chemical dependency issues, and continued to minimize her own needs and her children's needs. The court terminated her parental rights for her two youngest children, T.M.D. and T.T.D. We affirm.

## FACTS

This appeal arises from a court order terminating Demetrius Jones's parental rights for two of her children, T.M.D. (born October 4, 2005) and T.T.D. (born October 31, 2007).[1]

T.M.D. was born prematurely and suffers from fetal alcohol syndrome. She has developmental delays and requires a high level of care. She receives speech and mental health therapy weekly, as well as developmental services in school. T.T.D. was also born prematurely and has slight adaptive delays, such as a disinterest in potty

---

[1] The father's parental rights were terminated by default on February 23, 2012, and were not the subject of the order at issue here.

training and frustration dressing himself. By the time of trial, T.T.D. made significant progress and no longer required speech or physical therapy.

Jones has two older sons, J.P. (born August 1, 1996) and T.D. (born July 2, 2000). T.D. has special needs and some learning disabilities, but is functioning well. J.P. is an honor student and thriving. Jones is involved in her two older boys' education and puts a priority on school. T.M.D.'s and T.T.D's CASA (court appointed special advocate) reported, "I am very impressed with how she has raised two such nice young men as a single mom."

On March 25, 2009, the court entered a dependency order for all four children, because of ongoing concerns about their health and safety, as well as Jones's failure to attend to her younger children's medical needs. Specifically, T.T.D. had severe diaper rash and Jones had missed several important doctors' appointments for the children. Jones told the court that she had been diagnosed with cancer and admitted that it affected her parenting. She agreed that dependency was in the best interests of her children.

The court ordered Jones to complete the following services: public health nurse and family preservation services once T.M.D. and T.T.D. returned home; drug/alcohol assessment and recommended treatment; and a psychological evaluation with a parenting component. The court subsequently ordered Jones to attend her children's medical appointments, submit to random urinalysis testing for 30 days, and ensure her children received recommended services.

T.M.D. and T.T.D. were placed in foster care. Both also began attending Childhaven, a developmental preschool. The CASA reported that T.M.D.'s speech

improved significantly during the dependency, though she still showed signs of delay and would need consistent treatment throughout childhood. The CASA also reported that T.T.D. appeared to be on track developmentally and was thriving in class. The two older boys remained in Jones's care.

At a June 2009 initial progress review, the court found Jones in partial compliance with court ordered services. However, the court noted that Jones made very limited progress toward correcting her parental deficiencies. She completed drug and alcohol screening, but had not finished her psychological evaluation. Also in June 2009, Jones was diagnosed as alcohol and cannabis dependent. She expressed willingness to participate in the recommended intensive outpatient treatment. She began treatment with New Traditions, but made limited progress and was discharged in November 2009 for inconsistent attendance.

On July 9, 2009, Jones completed a psychological evaluation with Dr. Carmela Washington-Harvey. Washington-Harvey diagnosed Jones with depression and personality disorder, not otherwise specified (NOS). She indicated that Jones exercised poor judgment in both her personal and parenting decisions, as evidenced by chronic neglect of her younger children. Washington-Harvey also conducted a parent-child observation as part of the evaluation. She noted that Jones was "quite appropriate with [T.M.D. and T.T.D.] She spoke calmly and read stories to her daughter. She allowed her son to explore the room and play independently. She was watchful enough to keep her children safe. They responded well to her attentions." However, Washington-Harvey observed, Jones sucked her thumb and seemed preoccupied or even depressed at times.

3

Washington-Harvey recommended that Jones participate in drug treatment, attend parenting classes with a focus on medically fragile children, participate in mental health counseling, and develop a strong support network for her and her children. She believed it "extremely doubtful that Ms. Jones will be able to parent her two younger children without the benefit of the above services and demonstration that she can successfully apply what she has learned to the parenting of her children and to her own self care in all aspects of her life." (Emphasis in original.)

In a November 2009 permanency planning order, the court found that Jones complied with court ordered services. She completed the psychiatric evaluation and began attending parenting classes, as well as a drug and alcohol assessment/relapse prevention program. However, an April 2010 dependency review hearing order found that Jones had five months of no treatment, though she reengaged in intensive outpatient chemical dependency treatment just before the hearing. She tested positive for marijuana six times in 2010. Likewise, she attended mental health counseling, but only once a month. The order explained that the goal for Jones was consistency and follow through. The order also noted that Jones was providing good care for her two older boys.

Subsequent review hearings found Jones in partial compliance with the court ordered services. In June 2011, the court wrote that Jones received very limited mental health treatment and stopped drug and alcohol treatment in December 2010, but resumed in April 2011. Jones also attended only about 20 percent of T.M.D.'s appointments, even though she was ordered to attend 80 percent of them. And, in the 90 days before the June hearing, she went to only two out of 20 possible appointments.

4

On November 29, 2011, after successive orders finding Jones noncompliant or in partial compliance with court ordered services, the State petitioned to terminate her parental rights for T.M.D. and T.T.D. The dependencies for J.P. and T.D. were eventually dismissed before the termination trial began.

In an April 2012 psychiatric evaluation shortly before trial, Dr. Joanne Solchany diagnosed Jones with chronic post traumatic stress disorder and personality disorder, NOS. Jones told Solchany that there was often domestic violence between her and her long-term boyfriend, and she was usually the instigator. Solchany also observed Jones with T.T.D. and T.M.D. She reported that Jones appeared bored and disengaged. The children seemed comfortable around Jones, but looked to the visit supervisor for their limits. Solchany concluded that Jones "does not seem to have the underlying emotional strength and substance to keep things stable in her life or care for her two younger children and the needs that they have." She recommended two years of intensive mental health therapy before Jones would be able to successfully parent T.M.D. and T.T.D.

At the termination trial, the children's social worker testified that Jones's parental deficiencies included unmet mental health needs, untreated chemical dependency, minimization of her own needs and those of her children, and social isolation. The social worker also testified that Jones inconsistently attended her mental health and chemical dependency appointments. The social worker explained that Jones would start treatment, then stop for several months, start up again right before court appearances, then stop again. In the eighteen months preceding trial, Jones went to only seven counseling appointments.

The trial court found that Jones showed little, if any, progress in correcting her parental deficiencies. On May 11, 2012, the trial court ordered termination as to both children. Jones appeals.

## DISCUSSION

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941-42, 169 P.3d 452 (2007). But, the State has an interest in protecting the physical, mental, and emotional health of children, as well. Id. To terminate parental rights, the State must first prove the six elements of former RCW 13.34.180(1) (2009) by clear, cogent, and convincing evidence. In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). The six requirements are:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future[; and]

. . . .

6

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Former RCW 13.34.180(1). Once these six statutory elements are met, the State must still prove by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b); In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

On appeal, findings of fact must be supported by substantial evidence in light of the clear, cogent, and convincing standard. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). "If there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court findings. Deference paid to the trial judge's advantage in having the witnesses before him is particularly important in deprivation proceedings." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

Jones argues that the State failed to prove three of the statutory prerequisites to termination: former RCW 13.34.180(1)(d), (e), and (f). Specifically, she argues that the State (1) failed to produce substantial evidence that she could not meet T.T.D.'s special needs in the near future, (2) failed to prove that it offered parenting classes for special needs children, and (3) failed to produce evidence to support the trial court's finding that the children were adoptable. She also contends that the court erred in finding termination to be in the best interests of the children.[2]

---

[2] She assigns error to findings of fact 2.10, 2.13, 2.14, 2.16, 2.17, 2.18, 2.19, 2.26, 2.27, 2.28, 2.30, 2.31, 2.32, 2.33, 2.34, 2.37 and conclusions of law 3.2 and 3.3.

I.  Likelihood that Conditions Will Be Remedied

Jones argues that the State failed to produce clear, cogent, and convincing evidence that there was little likelihood that Jones's parental deficiencies—specifically related to meeting T.T.D.'s needs—could not be corrected within the near future. Jones contends that her unresolved mental health and substance abuse issues were not of such magnitude that rendered her unfit to parent T.T.D. She points out that her parenting deficiencies were not severe enough to warrant the State seeking termination of her parental rights for the older boys, one of whom has special needs. Essentially, she argues that the trial court could have terminated her parental rights as to T.M.D., but then she could successfully parent T.T.D. because he had only limited adaptive delays and did not need specialized appointments.

Former RCW 13.34.180(1)(e) requires the State to prove "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." The focus of this factor is whether parental deficiencies have been corrected. In re Dependency of T.R., 108 Wn. App. 149, 165, 29 P.3d 1275 (2001). The time frame for determining the "near future" depends on the age of the child and the circumstances of the child's placement. In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

Jones is correct that T.T.D. made significant progress in overcoming his adaptive delays during dependency. He consistently attended Childhaven for three years during dependency. He received speech services and physical therapy, and began to thrive in a stable, structured environment. Despite this progress, at four and a half, T.T.D. continued to struggle with potty training and dressing himself. Though T.T.D. does not

require the same high level of care as T.M.D., he nonetheless needs consistent well-child and dental appointments. T.T.D.'s ongoing need for routine and structure is plain from the record, and Jones does not challenge the trial court's finding to that effect.

Mental illness alone is not proof a parent is unfit. T.L.G., 126 Wn. App. at 203. A court must examine the relationship between mental condition and parenting ability. Id. But, unrebutted evidence from two mental health counselors established that Jones's mental health and substance abuse problems significantly affected her ability to parent both of her younger children. In meeting with Washington-Harvey, Jones admitted to being depressed, having suicidal thoughts, crying spells, sleep problems, and anger control issues. Indeed, Washington-Harvey observed that Jones sucked her thumb and seemed depressed during her interactions with T.M.D. and T.T.D. Washington-Harvey also reported that Jones exercised poor judgment in both her parenting and personal life choices. She believed it "extremely doubtful" that Jones would be able to parent T.M.D. and T.T.D. without the benefit of drug treatment and mental health counseling.

However, Jones failed to complete either recommended treatment program during T.M.D. and T.T.D.'s dependency. For instance, in June 2009, Jones was referred to New Traditions, where she enrolled in a parenting class and intensive outpatient chemical dependency treatment. She was discharged several months later for inconsistent attendance and minimal progress. The discharge report recommended that Jones still complete intensive substance abuse treatment and mental health counseling. In February 2010, Jones also began drug and alcohol treatment at the Asian-American Chemical Dependency Treatment Services, dropped out in December 2010, and began treatment again in April 2011. She tested positive for marijuana six

times in 2010, and again in February 2012.[3] Jones also went to Healthpoint for mental health counseling in November 2009. Though Jones testified that she attended her appointments every two weeks as scheduled, the record showed that she only attended seven sessions in the 18 months preceding trial. Likewise, in 2011, the State provided for Jones to have 90 weekly mental health therapy sessions with counselor Martha Davis. However, Jones chose not to use that service.

At the time of trial, Solchany concluded that Jones still needed two years of consistent mental health therapy. However, Solchany noted that Jones "vacillated with her compliance to court ordered services, her visitation with [T.T.D. and T.M.D.], and her commitment to their developmental and medical care." In observing Jones interact with T.T.D. and T.M.D., Solchany reported that Jones seemed to lack energy to structure or contain the children's play. Without intensive treatment, Solchany believed Jones would be unable to parent T.M.D. and T.T.D., because she did not "have the underlying emotional strength and substance to keep things stable in her life or to care for her two younger children and the needs that they have."

Though T.T.D. does not require the same level of attention as T.M.D., this evidence establishes that Jones's unresolved mental health issues prevent her from providing the routine and structure that T.T.D. requires to thrive. While Jones may have been able to successfully parent her older children, Washington-Harvey and Solchany believed her incapable of parenting <u>both</u> her younger children without intensive mental health and chemical dependency treatment. For young children, waiting even one

---

[3] Jones testified this was a false positive, but was not able to produce corroborating evidence.

additional year for a parent to potentially remedy his or her deficiencies may be too long. In the Matter of A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988); T.R., 108 Wn. App. at 164-65. T.T.D. already waited several years for his mother to remedy her parental deficiencies, but she failed to do so. Waiting another two years was well beyond the near future for four and a half year old T.T.D.

Substantial evidence supports the finding that the State proved by clear, cogent, and convincing evidence that there was little likelihood that conditions would be remedied so that T.T.D. could be returned to Jones in the near future.

II. Necessary and Reasonable Services

Jones argues that all the necessary and reasonably available services were not offered to her, as required by former RCW 13.34.180(1)(d). Washington-Harvey recommended that Jones attend parenting classes focused on caring for medically fragile children. Jones argues that the State never offered her any such parenting classes, despite knowing of the recommendation for over two years. Jones also argues that the State failed to show that she was expressly and understandably offered education or training for T.T.D.'s special needs. She points out that there is considerable evidence establishing the State's effort to educate her about T.M.D.'s special needs, but the record shows minimal effort to do the same for T.T.D.

Former RCW 13.34.180(1)(d) requires that the State prove by clear, cogent, and convincing evidence that court ordered services "have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." The State must offer services

11

tailored to each parent's needs. In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). To meet this burden, the State must show either that it offered the parent remedial services but she did not avail herself of them, or that the parent waived her right to such services. In re Welfare of S.V.B., 75 Wn. App. 762, 770, 880 P.2d 80 (1994). A parent's unwillingness or inability to make use of provided services excuses the State from offering extra services that might have been helpful. In re Dependency of P.A.D., 58 Wn. App. 18, 26, 792 P.2d 159 (1990).

The State produced evidence that it offered Jones Public Health Nurse (PHN) and Intensive Family Preservation (IFP) services in 2008 after T.T.D.'s birth. These programs addressed infant care basics, as well as parenting and development education. Jones initially engaged with both services, but over time, her attendance was inconsistent and her progress minimal. She was eventually discharged from the IFP service for lack of participation. The State argues that Jones's failure to take full advantage of these services excuses its obligation to provide additional services, like parenting classes for medically fragile children. However, the PHN and IFP services were offered before the court entered a dependency order for T.M.D. and T.T.D. There is no evidence that the State offered the parenting classes specifically recommended by Washington-Harvey. Nor did the State show that such services were not reasonably available.

Even where the State inexcusably fails to offer a service to a willing parent, termination is nevertheless appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future. In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983). This means that when the record establishes that

12

offering services would have been futile, the trial court can make a finding that the State offered all reasonable services. In re Welfare of Ferguson, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), reversed on other grounds, 98 Wn.2d 589, 656 P.2d 503 (1983). What is considered the foreseeable future depends on the age of the child. T.R., 108 Wn. App. at 164.

In Hall, the Supreme Court held that the State failed to provide suggested remedial services. 99 Wn.2d at 850. However, the court did not reverse, because there was sufficient evidence in the record that services would not have made the father a good parent in the foreseeable future. Id. at 851. Testimony established that correcting his parental deficiencies would require great effort and the father admitted he could not care for his child immediately. Id. Because his son was four at the time, parenting training would not remedy the father's deficiencies in the child's foreseeable future. Id. at 844, 851. Likewise, in T.R., the mother was provided numerous services for several years, but still did not possess the necessary skills to parent her child, who was six years old at the time. 108 Wn. App. at 164-66. Therefore, substantial evidence supported the trial court's finding that there was little likelihood the mother could acquire adequate parenting skills in the child's foreseeable future. Id. at 166.

Jones's parental deficiencies included her untreated mental health and chemical dependency issues. In 2009, Washington-Harvey believed it "extremely doubtful" that Jones could parent her younger children without the benefit of mental health counseling and chemical dependency treatment. The record clearly shows that the State offered Jones these services, but she failed to consistently engage in or complete any of them. Jones's mental health issues clearly remained unresolved at the time of trial, because

13

Solchany concluded that Jones needed an additional two years of intensive, consistent mental health therapy before she could successfully parent T.M.D. and T.T.D.

Jones also continued to minimize her children's needs and missed important appointments for them, despite the State offering her parenting classes through New Traditions. The State also offered daycare for her older child, T.D., so she could more easily attend T.M.D.'s speech and mental health therapy appointments. But, she elected not to use this service. Jones was encouraged to participate in T.M.D.'s and T.T.D.'s education, development, and therapy at Childhaven. The children's social worker emphasized to Jones that it was imperative that she show interest and ability to attend the children's therapy, doctor, and school related appointments. However, Jones visited the children only once at Childhaven. Likewise, Jones attended only 20 percent of T.M.D.'s appointments, despite being ordered to attend 80 percent of them. In the 90 days before the court's June 2011 hearing, Jones attended only two out of 20 possible appointments.

T.M.D. and T.T.D. waited three years in foster care for Jones to correct her parental deficiencies, but she failed to do so. The trial court expressed concern about the amount of time the two children had already spent in out-of-home care. The children's social worker also testified that this ongoing "limbo" and impermanency was harmful to the children. To wait another two years or longer is beyond T.M.D.'s and T.T.D.'s foreseeable future.

In sum, Jones's parental deficiencies with respect to her mental health and chemical dependency had not been addressed due to her failure to utilize the available services over a three year period. At the time of trial, these deficiencies could not be

remedied within the foreseeable future relative to the children's ages. This is sufficient for us to conclude that the failure to provide parenting classes specifically tailored for T.M.D.'s and T.T.D.'s special needs is not a bar to termination. Those classes would not have remedied Jones's other deficiencies.

III. Continuation of the Parent-Child Relationship

Jones argues that the State failed to meet its burden of proving by clear, cogent, and convincing evidence that continuation of the parent-child relationship clearly diminishes the child's prospects for adoption. Specifically, she asserts that a social worker's testimony that the children were adoptable is not enough—the State must call an adoption specialist. Jones cites an Arkansas case in which an adoption specialist testified that though the children had some developmental delays, they still had adoption prospects. Campbell v. Ark. Dept. of Human Servs., 2013 Ark. App. 84, 2013 WL 541095, at *7. However, that case did not hold that an adoption specialist was required to testify in order to establish the children's adoption prospects. Jones cites no Washington case to that effect, either.

Indeed, in In re Dependency of K.D.S., the father's social worker testified regarding the child's adoption prospects and the father's inability to understand his daughter's needs. 176 Wn.2d 644, 648-49, 294 P.3d 695 (2013). The court noted that the plain language of former RCW 13.34.180(1)(f) merely requires the trial court to find that the continued parent-child relationship diminishes the child's prospects of integration into a stable and permanent home. Id. at 658. The State does not need to prove that a stable and permanent home is available at the time of termination. Id.

Both T.M.D. and T.T.D. require consistency and structure, which developmental childcare and their foster parents have been able to provide. Jones's inability to follow through with mental health and substance abuse treatment significantly impacts her ability to provide for their ongoing needs. The social worker testified that the children have adoption prospects and need the permanency of adoption. She explained that continuing to live in foster care and see their mother made adoption difficult. Substantial evidence supports the finding that the State proved by clear, cogent, and convincing evidence that a continuing parent-child relationship diminishes the likelihood that T.M.D. and T.T.D. will be prepared to integrate into a stable and permanent home.

IV.    Best Interests of the Children

Jones argues that termination is not in her children's best interests, because they are bonded to her and their older brothers. Jones maintains that separating T.M.D. and T.T.D. from their family will cause psychological and emotional harm. Whether termination is in the children's best interests need be proved by only a preponderance of the evidence. A.B., 168 Wn.2d at 912. The overriding goal of a termination proceeding is to serve the children's best interests. Aschauer, 93 Wn.2d at 695. Where a parent has been unable to remedy his or her parental deficiencies over a lengthy dependency period, a court is "'fully justified'" in finding termination in the child's best interests. T.R., 108 Wn. App. at 167 (quoting A.W., 53 Wn. App. at 33).

Before dependency, T.M.D. and T.T.D. languished in Jones's care. Jones then had three years to address her mental health issues, complete chemical dependency treatment, and demonstrate her commitment to T.M.D.'s and T.T.D.'s needs. She was unable to do so. She persistently failed to follow through and continued to miss critical

appointments for the children. Meanwhile, T.M.D. and T.T.D. began to thrive from the therapy, care, routine, and structure provided by Childhaven and their foster family. We are always reluctant to deprive parents of rights with respect to their children, and it is particularly sad when the parent cares for the children. However, we cannot ignore the children's needs. We hold that the trial court did not err in concluding that terminating Jones's parental rights was in T.M.D.'s and T.T.D.'s best interest.

We affirm.

Appelwick, J

WE CONCUR:

Spearman, A.C.J.

Becker, J.

17